**SPENCER FANE LLP**
David E. Funkhouser III, Esq., Bar No. 022449
Jessica A. Gale, Esq., Bar No. 030583
2415 E. Camelback Road, Suite 600
Phoenix, AZ 85016-4251
Telephone: (602) 333-5451
Facsimile: (602) 333-5431
Email:   dfunkhouser@spencerfane.com
         jgale@spencerfane.com

**GOODWIN PROCTER LLP**
Scott T. Weingaertner, Esq. *(pro hac vice to be forthcoming)*
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8800
Facsimile: (212) 202-6268
Email: SWeingaertner@goodwinlaw.com

*Attorneys for Defendant TrackMan, Inc.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Wyoming Intellectual Property Holdings, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>TrackMan, Inc.,<br><br>Defendant. | Case No. 2:23-cv-02518-JJT<br><br>**DECLARATION OF SCOTT T. WEINGAERTNER**<br><br>(Assigned to the Hon. John J. Tuchi) |

I, Scott T. Weingaertner, state under penalty of perjury that the following is true and correct:

1.    I am a resident of the United States and over the age of 21. Unless otherwise specified, I have personal knowledge of the facts contained in this declaration. If called as a witness, I could testify competently to the matters set forth herein.

2.    I am an attorney at the law firm of Goodwin Procter LLP, counsel for Defendant TrackMan, Inc. ("TrackMan") in the above-captioned action. I submit this

1

declaration in support of TrackMan's motion to dismiss the Complaint of Plaintiff Wyoming Intellectual Property Holdings, LLC ("Plaintiff").

3.      Attached as Exhibit A is a true and correct copy of my February 10, 2024 email chain with Randall Garteiser (counsel for Plaintiff).

4.      Attached as Exhibit B is a true and correct copy of a February 11, 2024 email from David E. Funkhouser III (counsel for TrackMan) to Randall Garteiser and Kenneth Motolenich-Salas (counsel for Plaintiff), which includes the Court's December 7, 2023 Order (ECF No. 9) attached to the email.

5.      Attached as Exhibit C is a true and correct copy of a February 12, 2024 email from Randall Garteiser (counsel for Plaintiff) to David E. Funkhouser III (counsel for TrackMan).

6.      Attached as Exhibit D is a true and correct copy of U.S. Patent No. 8,617,671.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, and that I executed this declaration in Princeton Junction, New Jersey on this 12th day of February 2024.


*s/ Scott T. Weingaertner*
Scott T. Weingaertner

*Attorney for Defendant TrackMan, Inc.*

# Exhibit A

| | |
|---|---|
| **From:** | Weingaertner, Scott T |
| **To:** | Randall Garteiser |
| **Cc:** | Funkhouser III, David E. |
| **Subject:** | RE: Wyoming Intellectual Property Holdings LLC v. Trackman, Inc. |
| **Date:** | Saturday, February 10, 2024 12:58:22 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |

Randy,

TrackMan's deadline to respond to the complaint is Monday, February 12. As noted our prior discussion and emails below, TrackMan has proposed that WIPH amend the complaint, on consent pursuant to Rule 15(a)(2), to name the correct patent. As WIPH has not yet accepted that proposal or amended, TrackMan will be compelled to file a motion to dismiss. To avoid motion practice, we again urge you to file the amended complaint. The effort involved to amend the complaint is minimal. If WIPH does not amend by 12 pm Arizona time on February 12, TrackMan will have no choice but to file its motion.

Best regards,

Scott

**Scott T. Weingaertner**
Partner



Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
o  +1 212 459 7067
M +1 609 462 4099
f  +1 212 202 6268
SWeingaertner@goodwinlaw.com



**From:** Weingaertner, Scott T
**Sent:** Wednesday, January 24, 2024 2:15 AM
**To:** 'Randall Garteiser' <rgarteiser@ghiplaw.com>
**Subject:** RE: Wyoming Intellectual Property Holdings LLC v. Trackman, Inc.

Randy,

It looks like our follow-on messages crossed in the mail. I am sorry, but I have no idea what you are

referring to.  My client showed up to an initial call that your client was not able to make it – but no problem, these things happened, we gladly rescheduled.  Then, we had a civilized discussion that seemed productive enough.  During that call I raised the issue with the complaint identifying the wrong patent and how that can be easily addressed in a way that would avoid needless contested motion practice – and which would require minimal effort on your part.  You agreed and certainly did not raise any problems with this approach during the call.  So far, so good.  Then I (and I believe this was mutual) we expressed interested in a follow-on call sometime soon that we hoped would avoid any further filings.  My email simply reflected these things.  I am baffled by your responses – perhaps there is a misunderstanding.  I am awake and could speak by phone now, if there is a chance it would be productive.

Thank you.

Best,
Scott

Scott T. Weingaertner
Partner



Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
o  +1 212 459 7067
M +1 609 462 4099
f  +1 212 202 6268
SWeingaertner@goodwinlaw.com



**From:** Randall Garteiser <rgarteiser@ghiplaw.com>
**Sent:** Wednesday, January 24, 2024 2:05 AM
**To:** Weingaertner, Scott T <SWeingaertner@goodwinlaw.com>
**Subject:** Re: Wyoming Intellectual Property Holdings LLC v. Trackman, Inc.

***EXTERNAL***
I'm disappointed your client wasted my time and my principal's time.  I'm embarrassed.  I will not entertain your requests in the future.  This is my job and I take it very seriously.


On Jan 23, 2024, at 9:37 PM, Randall Garteiser <rgarteiser@ghiplaw.com> wrote:

Thanks, since WIPH has to file an Amended Complaint, offer withdrawn, and we will just litigate.

Be well,

Randall

On Jan 23, 2024, at 9:31 PM, Weingaertner, Scott T
<SWeingaertner@goodwinlaw.com> wrote:

Hello Randy,

I write further to our initial settlement discussions last week. During our
call, I'd noted that Count 1 and the Prayer for Relief in the complaint filed
by your client in this case identifies U.S. Patent No. 8,617,671. That is a
different patent from the one, namely U.S. Patent No. 9,384,671, referred
to elsewhere in the complaint and its attachments and which the
complaint alleges your client has the right to assert.

When we discussed this issue, you and I agreed it made sense, and would
be most efficient, for your side to file an amended complaint to correct
this apparent clerical error. I indicated that we would consent, per Rule
15(a)(2) FRCP, to such a motion addressing this patent numbering issue.

Given the upcoming extended deadline for Trackman to file its responsive
pleading, kindly confirm your intention to file the amendment, and please
let us know when you intend to file it. Can you also send us a copy of the
intended draft amended complaint for our review so that we can provide
our written consent?

Thank you.

Best,
Scott

Scott T. Weingaertner
Partner

<image001.png>
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
o  +1 212 459 7067
M +1 609 462 4099
f  +1 212 202 6268
SWeingaertner@goodwinlaw.com


<image002.png> <image003.png> <image004.png> <image005.png> <image006.png>

*****************************************************************

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

*****************************************************************

# Exhibit B

| | |
|---|---|
| **From:** | Funkhouser III, David E. |
| **To:** | Randall Garteiser; Weingaertner, Scott T |
| **Cc:** | Kenneth Motolenich-Salas; ghpam@ghiplaw.com; Mentzer, Stefan; Keegan, Timothy; Funkhouser III, David E.; Gale, Jessica |
| **Subject:** | RE: [EXTERNAL] Re: Wyoming Intellectual Property Holdings LLC v. Trackman, Inc. - Final Demand to Amend Complaint |
| **Date:** | Sunday, February 11, 2024 11:52:30 AM |
| **Attachments:** | US_DIS_AZD_2_23cv2518_d97531195e716_ORDER_IT_IS_HEREBY_ORDERED_that_motions_to_dismiss.pdf |

***EXTERNAL***

Good morning, Randy and Ken.

We understand that Scott Weingaertner has now tried, on several occasions, to get your agreement to amend the Complaint and work with you to avoid burdening the Court with a needless Motion to Dismiss in view of your client's erroneous Complaint naming in the infringement count and prayer for relief a patent it does not own.
  Indeed, your amending under these circumstances would comply with the attached Order from the Court (ECF No. 9) and, in my opinion at least, goes to the very heart of the same.

For reasons we do not understand, and despite your initial apparent willingness to amend given Scott's consent to such an amendment, you have refused to cooperate to avoid motion practice to correct your client's incorrect patent identification in the Complaint.  I also understand from Scott that he never discussed any other defenses to be raised in such a motion, at this time at least, other than a need to dismiss if the Complaint asserts a patent named in error and not owned by your client, who would have no standing to sue and no good faith basis to do so.  Again, to be clear, the Court's Order, and common sense itself, call for an amendment to correct the material error in your client's current Complaint, the Federal Rules provide for an easy mechanism to address it, and our team indicated weeks ago that we would consent to such an amendment to avoid judicial and party burdens, which consent still stands.

However, if you continue to refuse to amend the Complaint to address this very serious inconsistency, we will have no choice but to file a Motion to Dismiss tomorrow to address the same.

Therefore, please let us know by no later than noon MST tomorrow, February 12, 2024, as to whether you will so amend.  If not, we will proceed to file the Motion to Dismiss and reserve our right to include this email chain as an exhibit to our Certificate of Conferral that we will also file per the Court's Order.

We look forward to your prompt and professional reply.

Thank you.

David

**David E. Funkhouser III**  Partner
Spencer Fane LLP

2415 E Camelback Rd Suite 600 | Phoenix, AZ 85016
**O** 602.333.5451
dfunkhouser@spencerfane.com | spencerfane.com

**From:** Randall Garteiser <rgarteiser@ghiplaw.com>
**Sent:** Saturday, February 10, 2024 1:25 PM
**To:** Weingaertner, Scott T <SWeingaertner@goodwinlaw.com>; Funkhouser III, David E.
<dfunkhouser@spencerfane.com>
**Cc:** Kenneth Motolenich-Salas <ken@motosalaslaw.com>; ghpam@ghiplaw.com
**Subject:** [EXTERNAL] Re: Wyoming Intellectual Property Holdings LLC v. Trackman, Inc.

**[Warning] This E-mail came from an External sender. Please do not open links or attachments unless you
are sure it is trusted.**

Hi Scott,

Thanks or the invitation, but Trackman's motion apparently contains additional defenses under Rule
12 that your client has not disclosed, so please proceed on Monday in the best interest of your
client.
WIPH is ready to litigate this case after several extensions.

Now that we are in the litigation stage, please copy our local counsel Ken and our email list
ghplam@ghiplaw.com.

ghpam@ghiplaw.com
ken@motosalaslaw.com

Be well,
Randy

On Feb 10, 2024, at 11:58 AM, Weingaertner, Scott T
<SWeingaertner@goodwinlaw.com> wrote:

Randy,

TrackMan's deadline to respond to the complaint is Monday, February 12.  As noted
our prior discussion and emails below, TrackMan has proposed that WIPH amend the
complaint, on consent pursuant to Rule 15(a)(2), to name the correct patent.  As WIPH
has not yet accepted that proposal or amended, TrackMan will be compelled to file a
motion to dismiss.  To avoid motion practice, we again urge you to file the amended

complaint.  The effort involved to amend the complaint is minimal.  If WIPH does not amend by 12 pm Arizona time on February 12, TrackMan will have no choice but to file its motion.

Best regards,

Scott


**Scott T. Weingaertner**
Partner

<image001.png>
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
o  +1 212 459 7067
M +1 609 462 4099
f   +1 212 202 6268
SWeingaertner@goodwinlaw.com

<image002.png> <image003.png> <image004.png> <image005.png> <image006.png>

*********************************************************************

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

*********************************************************************

1
2
3
4
5
6                        **IN THE UNITED STATES DISTRICT COURT**
7                            **FOR THE DISTRICT OF ARIZONA**
8
9    Wyoming   Intellectual   Property   Holdings       No. CV-23-02518-PHX-JJT
     LLC,
10                          Plaintiff,                   **ORDER**
11
     v.
12
     Trackman Incorporated,
13
                            Defendant.
14
15
16          This matter having recently come before this Court,

17          **IT IS HEREBY ORDERED** that motions to dismiss pursuant to Fed. R. Civ. P.

18   12(b) and motions to strike pursuant to Fed. R. Civ. P. 12(f) are discouraged if the defect

19   that would be the subject of the motion can be cured by filing an amended pleading.

20   Therefore, the parties must meet and confer prior to the filing of a motion to dismiss or

21   motion to strike to determine whether it can be avoided. Consequently, motions to dismiss

22   and motions to strike must be accompanied by a separately-filed notice of certification of

23   conferral, stating that the parties have conferred to determine whether an amendment could

24   cure a deficient pleading and that they have been unable to agree that the pleading is curable

25   by a permissible amendment. **The Certification of Conferral shall include a brief**

26   **summary of the issues the parties discussed but were unable to resolve.** In addition,

27   parties shall endeavor not to oppose motions to amend that are filed prior to the Rule 16

28   Scheduling Conference or within the time set for the Rule 16 Case Management Order.

Motions to dismiss and motions to strike that are not accompanied by the required certification are subject to striking on the Court's own motion.

**IT IS FURTHER ORDERED** that Plaintiff shall serve a copy of this Order on Defendants.

Dated this 7th day of December, 2023.

Honorable John J. Tuchi
United States District Judge

# Exhibit C

| | |
|---|---|
| **From:** | Randall Garteiser |
| **To:** | Funkhouser III, David E. |
| **Cc:** | Weingaertner, Scott T; Kenneth Motolenich-Salas; ghpam@ghiplaw.com; Mentzer, Stefan; Keegan, Timothy; Gale, Jessica |
| **Subject:** | Re: [EXTERNAL] Wyoming Intellectual Property Holdings LLC v. Trackman, Inc. - Final Demand to Amend Complaint |
| **Date:** | Monday, February 12, 2024 4:55:57 PM |

***EXTERNAL***

David,

We didn't get a chance to discuss resolution with you personally.  So, we can agree to an extension of another week or two if your client needs it or if your team as counsel need it.  Or your client can file its response and we can talk afterwards.  I just got ahold of my client and wanted to pass that along.

Based on the numbers we've collected and reducing that to a calculated reasonable royalty reduced again for the uncertainty of this stage of the litigation, we just would like a counter to our offer, just to show your client is interested in a early resolution.

Be well,

Randall

# Exhibit D

US008617671B2

(12) **United States Patent**
Greve et al.

(10) Patent No.: **US 8,617,671 B2**
(45) Date of Patent: ***Dec. 31, 2013**

(54) **EMBLEM ASSEMBLY AND METHOD OF FORMING SAME**

(75) Inventors: **Bruce N. Greve**, Clarkston, MI (US); **Kitty L. Gong**, Macomb, MI (US)

(73) Assignee: **GM Global Technology Operations LLC**, Detroit, MI (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/892,030**

(22) Filed: **Sep. 28, 2010**

(65) **Prior Publication Data**

US 2012/0076960 A1      Mar. 29, 2012

(51) Int. Cl.
*A47G 1/12*      (2006.01)
*B29C 39/10*      (2006.01)

(52) U.S. Cl.
USPC .............. **428/13**; 428/67; 428/187; 428/221; 428/542.2; 264/1.7; 264/132; 264/135; 264/246; 264/247; 264/251; 264/263; 264/268; 264/274

(58) Field of Classification Search
USPC ............ 428/13, 67, 187, 542.2, 221; 264/1.7, 264/132, 135, 246, 247, 251, 263, 268, 274
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,076,789 A | 2/1978 | Geller et al. | |
| 4,130,623 A | 12/1978 | Walter | |
| 4,292,827 A | * 10/1981 | Waugh | 72/46 |
| 4,481,160 A | * 11/1984 | Bree | 264/135 |
| 4,556,588 A | * 12/1985 | Rockwood | 428/13 |
| 4,769,100 A | 9/1988 | Short et al. | |
| 4,824,506 A | 4/1989 | Hoerner et al. | |
| 4,826,713 A | * 5/1989 | Cook | 428/31 |
| 4,828,637 A | 5/1989 | Mentzer et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 9321214 U1 | 9/1996 |
| DE | 102007041347 A1 | 3/2009 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 13/343,763, filed Jan. 5, 2012, Catherine A. Ostrander, Kitty L. Gong, Charles B. Buehler, Chris A. Oberlitner.

(Continued)

*Primary Examiner* — Cathy Lam
(74) *Attorney, Agent, or Firm* — Quinn Law Group, PLLC

(57)      **ABSTRACT**

An emblem assembly configured for attachment to a vehicle includes a first element and a second element. The first element is configured for attachment to the vehicle and has a first surface and a second surface recessed from the first surface. The second element is configured for attachment to the first element and has a third surface, a fourth surface spaced apart from the third surface, and a fifth surface extending between the third and fourth surfaces, wherein the fifth surface is spaced apart from the second surface to define a channel therebetween. The assembly includes a first coating disposed on the third surface and a tape disposed in contact with at least a portion of each of the second surface, the first coating, and the fifth surface to thereby fill at least a portion of the channel. A method of forming the assembly is also disclosed.

**20 Claims, 3 Drawing Sheets**



## US 8,617,671 B2
Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,838,973 | A | 6/1989 | Mentzer et al. |
| 4,856,857 | A * | 8/1989 | Takeuchi et al. ............... 359/3 |
| 4,868,030 | A | 9/1989 | Mentzer et al. |
| 4,957,802 | A | 9/1990 | Mentzer et al. |
| 4,960,558 | A | 10/1990 | Short |
| 4,976,896 | A | 12/1990 | Short et al. |
| 5,021,278 | A | 6/1991 | Short |
| 5,433,980 | A * | 7/1995 | Auld et al. ............. 428/13 |
| 5,480,688 | A * | 1/1996 | Kaumeyer ............. 428/13 |
| 5,698,276 | A * | 12/1997 | Mirabitur ............. 428/31 |
| 5,795,527 | A * | 8/1998 | Nakamura et al. ......... 264/267 |
| 5,933,867 | A * | 8/1999 | Corder ............. 2/160 |
| 6,071,621 | A * | 6/2000 | Falaas et al. ............. 428/425.8 |
| 6,372,341 | B1 * | 4/2002 | Jung et al. ............. 428/354 |
| 6,579,397 | B1 | 6/2003 | Spain et al. |
| 6,641,921 | B2 * | 11/2003 | Falaas et al. ............. 428/425.8 |
| 6,646,022 | B2 * | 11/2003 | Okazaki et al. ......... 522/153 |
| 6,682,805 | B1 | 1/2004 | Lilly |
| 6,818,305 | B2 * | 11/2004 | Murar et al. ............. 428/412 |
| 6,835,348 | B2 | 12/2004 | Hirosue et al. |
| 6,863,854 | B2 | 3/2005 | Lilly |
| 7,390,454 | B2 | 6/2008 | Ostrander et al. |
| 7,645,416 | B2 | 1/2010 | Buehler et al. |
| 2002/0032250 | A1 | 3/2002 | Okazaki et al. |
| 2003/0008134 | A1 | 1/2003 | Murar et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0060721 A1 | 9/1982 |
| EP | 0942820 A1 | 9/1999 |
| WO | 9908870 A1 | 2/1999 |

OTHER PUBLICATIONS

U.S. Appl. No. 13/303,729, filed Nov. 23, 2011; Catherine A. Ostrander, Kitty L. Gong, Charles K. Buehler, Chris A. Oberlitner.
U.S. Appl. No. 13/361,173, filed Jan. 30, 2012; Catherine A. Ostrander, Joel Colombo, Mary K. Gusie, Kitty L. Gong, Charles K. Buehler, Michael P. Balogh.

* cited by examiner







*Fig-7*

US 8,617,671 B2

1

# EMBLEM ASSEMBLY AND METHOD OF FORMING SAME

## TECHNICAL FIELD

The present disclosure generally relates to emblem assemblies configured for attachment to a vehicle.

## BACKGROUND

Vehicles often include distinctive badging, such as emblems, to denote a brand and/or manufacturer of the vehicle. Such emblems are generally designed to convey a positive and easily-recognizable association between the vehicle and the manufacturer of the vehicle, and are therefore often attached to visible exterior and interior surfaces of the vehicle, e.g., front grilles, rear liftgates and trunks, wheel covers, and/or steering wheels. Any defect or degradation of the emblem may diminish the perceived quality of the vehicle and/or tarnish the reputation of the vehicle manufacturer.

## SUMMARY

An emblem assembly configured for attachment to a vehicle includes a first element and a second element. The first element is configured for attachment to the vehicle and has a first surface and a second surface recessed from the first surface. The second element is configured for attachment to the first element and has a third surface, a fourth surface spaced apart from the third surface, and a fifth surface extending between the third surface and the fourth surface, wherein the fifth surface is spaced apart from the second surface to define a channel therebetween. The emblem assembly further includes a first coating disposed on the third surface, and a tape disposed in contact with at least a portion of each of the second surface, the first coating, and the fifth surface to thereby fill at least a portion of the channel and adhere the second element to the first element.

In one variation, the first coating includes vacuum metallized aluminum and is substantially free from degradation, and the tape includes acrylic and foam. The emblem assembly also includes a transparent second element and a second coating disposed on the first coating. In addition, the fifth surface abuts the third surface to form a corner, and the tape is disposed in contact with at least a portion of each of the second surface, the first coating, and the fifth surface to thereby wrap around the corner, fill at least a portion of the channel, and adhere the second element to the first element.

A method of forming the emblem assembly includes positioning the tape onto the second element, and, after positioning, wrapping at least a portion of the fifth surface and the first coating with the tape. After wrapping, the method further includes inserting the second element into the first element whereby the tape contacts each of the fifth surface, the first coating, and the second surface to adhere the second element to the first element and thereby form the emblem assembly.

The emblem assembly, and more specifically, the first coating of the emblem assembly, exhibits minimized degradation over an operating life of a vehicle. For example, the first coating is substantially free from corrosion after prolonged exposure to cleaning solutions and vehicle operating environments. In particular, the tape sufficiently seals the channel of the emblem assembly to prevent ingress of fluids and/or contaminants to thereby minimize contact between such fluids and/or contaminants and the first coating. Further, the method allows for economical and efficient formation of the emblem

2

assembly, and the emblem assembly contributes to an increased perceived quality of the vehicle.

The above features and advantages and other features and advantages of the present disclosure are readily apparent from the following detailed description of the best modes for carrying out the disclosure when taken in connection with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic cross-sectional view of an emblem assembly having a planar configuration and including a first element and a second element;

FIG. 2 is a schematic cross-sectional view of the emblem assembly of FIG. 1 along section line 2-2;

FIG. 3 is a schematic cross-sectional view of a portion of the emblem assembly of FIG. 1;

FIG. 4 is a schematic cross-sectional view of a portion of another embodiment of the emblem assembly of FIG. 1;

FIG. 5 is a schematic cross-sectional view of a portion of yet another embodiment of the emblem assembly of FIG. 4;

FIG. 6 is a schematic illustration of a method of forming the emblem assemblies of FIGS. 1, 4, and 5; and

FIG. 7 is a schematic fragmentary perspective planar view of a corner configuration of the emblem assembly of FIG. 1.

## DETAILED DESCRIPTION

Referring to the Figures, wherein like reference numerals refer to like elements, an emblem assembly is shown generally at 10 in FIG. 1. The emblem assembly 10 is configured for attachment to a vehicle 12, such as an automotive vehicle. However, the emblem assembly 10 may also be useful for non-automotive vehicles such as, but not limited to, construction, rail, aviation, and marine vehicles.

Referring again to FIG. 1, the emblem assembly 10 includes a first element 14 configured for attachment to the vehicle 12. For example, the first element 14 may be a carrier or bezel and may be configured for attachment to any location or component (not shown) of the vehicle 12, such as, but not limited to, a front grille, rear liftgate, trunk lid, wheel cover, side panel, trim panel, and/or steering wheel. The first element 14 may be attached to the vehicle 12 via any suitable method or attachment device, e.g., screws, tape, or a snap-fit. Therefore, the first element 14 may be formed from any suitable material and selected according to an expected operating environment of the vehicle 12. By way of non-limiting examples, the first element 14 may be formed from metal, plastic, and combinations thereof. In addition, the first element 14 may be coated for aesthetics and/or protection. For example, the first element 14 may be formed from chrome-plated plastic, such as acrylonitrile butadiene styrene (ABS).

With continued reference to FIG. 1, the first element 14 has a first surface 16 and a second surface 18 recessed from the first surface 16. That is, the second surface 18 may extend from the first surface 16 and define a recession or cavity 20 (FIG. 6) within the first element 14. In one example shown in FIG. 1, the second surface 18 may be substantially U-shaped. During vehicle operation, a portion of the first surface 16 may be visible to a potential occupant or operator of the vehicle 12 when viewed from a direction of arrow 22 (FIG. 1). In contrast, the second surface 18 may be substantially hidden by another component of the emblem assembly 10, as set forth in more detail below.

The emblem assembly 10 also includes a second element 24, as shown in FIG. 1. The second element 24 is configured for attachment to the first element 14 and may be generally

US 8,617,671 B2

3

sized and shaped to fit within the cavity 20 (FIG. 6) defined by the second surface 18 of the first element 14. For example, the second element 24 may be a lens configured for attachment to the aforementioned bezel, i.e., the first element 14. Further, comparatively more of the second element 24 may be visible to a potential occupant or operator of the vehicle 12 than the first element 14 when viewed from the direction of arrow 22. Therefore, the second element 24 may have a shape easily-recognizable as associated with a specific vehicle brand and/or manufacturer. For example, the second element 24 may have a square shape, a bowtie shape, a pointed shape, and/or may include a circular crest shape or a combination of letters. In addition, the second element 24 may have a shape that is the same or different than the shape of the first element 14.

Referring again to FIG. 1, the second element 24 has a third surface 26 and a fourth surface 28 spaced apart from the third surface 26. The third surface 26 may define a plurality of grooves 30 and/or voids 32 configured for reducing a weight of the second element 24 and/or enhancing attachment between the first element 14 and the second element 24. In general, the third surface 26 may be hidden from view upon attachment of the emblem assembly 10 to the vehicle 12 when viewed from a direction of arrow 22. In contrast, the fourth surface 28 may be visible to a potential occupant or operator of the vehicle 12 upon attachment of the emblem assembly 10 to the vehicle 12 when viewed from the direction of arrow 22.

Referring again to FIG. 1, the second element 24 also has a fifth surface 34 extending between the third surface 26 and the fourth surface 28, wherein the fifth surface 34 is spaced apart from the second surface 18 to define a channel 36 therebetween. That is, when the second element 24 is attached to the first element 14, as set forth in more detail below, the second surface 18 is disposed adjacent the fifth surface 34, and the channel 36 is defined therebetween. The channel 36 may have a width 38 of from about 0.3 mm to about 0.7 mm, e.g., about 0.5 mm, so as to define a minimal gap between the first element 14 and the second element 24. As such, the fifth surface 34 may also be substantially hidden from a vehicle occupant or operator when the first element 14 is attached to the second element 24.

As shown in FIG. 3, the fifth surface 34 and at least one of the third surface 26 and the fourth surface 28 may define an angle 40 therebetween of less than or equal to 90°. That is, a portion of the second element 24 may be tapered. Alternatively, although not shown, the third surface 26 and the fourth surface 28 may each be substantially perpendicular to the fifth surface 34.

The second element 24 may be formed from any suitable material. For example, the second element 24 may be formed from plastic, such as acrylic, metal, such as aluminum, and combinations thereof. In addition, the second element 24 may be translucent, and/or may be tinted to a specific color, e.g., gold or red. In one variation, the second element 24 is transparent.

Referring now to FIG. 2, the emblem assembly 10 of FIG. 1 also includes a first coating 42 disposed on the third surface 26. It is to be appreciated that for purposes of illustration the first coating 42 is not visible in FIG. 1. However, the first coating 42 is disposed on the third surface 26 of FIG. 1, as best shown in FIGS. 2 and 3. The first coating 42 may be a layer capable of imparting enhanced aesthetics to the second element 24 and the emblem assembly 10. For example, the first coating 42 may include aluminum to impart a sheen or metallic appearance to the second element 24.

The first coating 42 may be deposited on the third surface 26 via any suitable process. More specifically, in one embodiment, the first coating 42 may include vacuum metalized

4

aluminum. That is, the first coating 42 may be deposited onto the third surface 26 of the second element 24 via vacuum metallization. As used herein, the terminology "vacuum metallization" refers to a physical vapor deposition process capable of depositing a thin aluminum layer, i.e., the first coating 42, onto a plastic component, e.g., the second element 24. The first coating 42 may have a thickness 44 (FIG. 2) of from about 0.01 μm to about 0.2 μm. Further, the thickness 44 of the first coating 42 may not substantially vary along the third surface 26, and the first coating 42 may be disposed along the entire third surface 26, e.g., along any grooves 30 (FIG. 1) and/or voids 32 (FIG. 1) defined by the third surface 26.

Additionally, for the variation including the transparent second element 24, the first coating 42 may be visible through the fourth surface 28 when viewed from the direction of arrow 22 (FIG. 1). Therefore, to maximize the perceived quality of the vehicle 12, the first coating 42 may be substantially free from degradation, such as, but not limited to, corrosion, delamination, chipping, tears, uneven thickness 44, uneven sheen or gloss, and combinations thereof.

As best shown in FIG. 3, the first coating 42 may not extend along the fifth surface 34. That is, the first coating 42 may have a boundary 46 that terminates at an intersection of the third surface 26 and the fifth surface 34. In one variation, as shown in FIG. 3, the fifth surface 34 abuts the third surface 26 to form a corner 48. Therefore, the first coating 42 may be disposed solely along the third surface 26 so as not to wrap around the corner 48 of the second element 24.

Referring again to FIGS. 1-3, the emblem assembly 10 further includes a tape 50 disposed in contact with at least a portion of each of the second surface 18, the first coating 42, and the fifth surface 34 to thereby fill at least a portion of the channel 36 and adhere the second element 24 to the first element 14. More specifically, the tape 50 may abut the second surface 18 and wrap around the corner 48 (FIG. 3) of the second element 24 to thereby act as an insulator from or barrier to environmental contaminants and/or fluids. Therefore, as best shown in FIG. 3, the tape 50 also contacts the first coating 42, e.g., at the boundary 46 of the first coating 42, and fills at least a portion of the channel 36. Stated differently, the tape 50 may extend from the second surface 18 into the channel 36 and seal at least a portion of the channel 36 and the first coating 42 from the environment exterior to the vehicle 12. In this variation, therefore, the tape 50 may not be visible when viewed from a direction of arrow 22 in FIG. 1.

Alternatively, as shown in FIGS. 4 and 5, the tape 50 may substantially fill the channel 36. That is, the tape 50 may have an edge 52 (FIG. 5) that is substantially flush with the fourth surface 28. Therefore, in this variation, the tape 50 may be visible when viewed from a direction of arrow 22 in FIG. 1.

As shown in FIGS. 3 and 6 and set forth above, the tape 50 is disposed in contact with at least a portion of each of the second surface 18, the first coating 42, and the fifth surface 34. That is, the tape 50 may be positioned, and repositioned if necessary, to contact at least a portion of, for example, the first coating 42. In one example, the tape 50 may be positioned onto the second element 24 as shown in FIG. 6, and then wrapped around the corner 48 (FIG. 3) to thereby contact each of the first coating 42 and the fifth surface 34. That is, with reference to FIG. 3, the tape 50 is disposed in contact with at least a portion of each of the second surface 18, the first coating 42, and the fifth surface 34 to thereby wrap around the corner 48, fill at least a portion of the channel 36, and adhere the second element 24 to the first element 14. Further, if the tape 50 is misaligned and/or misregistered with

US 8,617,671 B2

5

6

respect to the second element 24, the tape 50 may be repositioned to a desired alignment and/or registration.

As set forth above, the tape 50 adheres the second element 24 to the first element 14. More specifically, as best shown in FIG. 2, the tape 50 may adhere the second surface 18 to the first coating 42 so that the second element 24 is attached to the first element 14. The tape 50 may be impermeable to environmental contaminants, e.g., dirt, rain, snow, and cleaning agents encountered during operation of the vehicle 12. The tape 50 may have a thickness 54 (FIG. 2) of from about 0.2 mm to about 0.8 mm. For example, the tape 50 may have a thickness 54 of about 0.5 mm so as to contact each of the second surface 18 and the fifth surface 34 (FIG. 3) within the channel 36 (FIG. 3). More specifically, the tape 50 may sufficiently contact, e.g., uniformly contact, both of the second surface 18 and the fifth surface 34 to seal off any potential entry routes for environmental contaminants and thereby protect the first coating 42. That is, the tape 50 may be "wet-out" to uniformly contact each of the second surface 18 and the fifth surface 34, minimize or eliminate any air pockets between the second surface 18, the tape 50, and the fifth surface 34, and thereby protect the first coating 42. Further, the tape 50 may exhibit compressability and may have an elongation at break of at least 100% when measured in accordance with test method ASTM D-3759. That is, the tape 50 may stretch and compress within the channel 36 and seal off any entry routes for environmental contaminants. Therefore, as best shown in FIG. 1, the fourth surface 28 may be substantially flush with the first surface 16. That is, the second element 24 may not protrude from the first element 14, but rather the fourth surface 28 of the second element 24 may be coplanar with the first surface 16 of the first element 14. Further, as shown in FIG. 7, the second element 24 may be disposed within a periphery 27 of the first element 14, and the tape 50 may compress within the channel 36.

In one variation, the tape 50 may include acrylic and foam. That is, the tape 50 may include a viscoelastic foam core and acrylic adhesive, and may be double-sided. That is, the acrylic adhesive may be disposed on two opposing surfaces of the viscoelastic foam core. A specific example of a suitable tape 50 is 3M™ Acrylic Foam Tape 5344, commercially available from 3M of St. Paul, Minn.

Referring now to FIG. 5, the emblem assembly 10 may further include a second coating 56 sandwiched between and disposed in contact with each of the first coating 42 and the tape 50. The second coating 56 may be a layer capable of imparting enhanced protection to the first coating 42 and the emblem assembly 10. For example, the second coating 56 may be an alkyd enamel and/or may include ultraviolet protectants, corrosion inhibitors, sacrificial constituents, and combinations thereof. That is, the second coating 56 may be selected to degrade before the first coating 42 when subjected to identical operating environments, e.g., dirt, rain, snow, and/or cleaning agents.

The second coating 56 may be deposited on the first coating 42 via any suitable process. For example, the second coating 56 may be applied via dip-coating, spraying, rolling, electrostatic painting, and combinations thereof. The second coating 56 may have a thickness 58 (FIG. 5) of from about 0.05 μm to about 0.15 μm. The thickness 58 of the second coating 56 may not substantially vary along the first coating 42 disposed on the third surface 26, and the second coating 56 may be disposed along the entire first coating 42 and follow the contour of the first coating 42 along any grooves 30 (FIG. 1) and/or voids 32 (FIG. 1) defined by the third surface 26.

Additionally, the second coating 56 may not be visible through the first coating 42 when viewed through the fourth

surface 28 in the direction of arrow 22 (FIG. 1). That is, the first coating 42 may not be transparent and/or translucent, and may therefore block the second coating 56 from view when viewed from the direction of arrow 22. However, the second coating 56 may have a dark hue or color, e.g., black, to impart perceived depth or tone to the first coating 42. That is, the second coating 56 may function both as a primer and a protectant, i.e., to further protect the first coating 42 from degradation such as corrosion.

As best shown in FIG. 5, the second coating 56 may not extend along the fifth surface 34. That is, the second coating 56 may have a second boundary 60 aligned with the boundary 46 of the first coating 42. Stated differently, the second boundary 60 may also align with the intersection of the third surface 26 and the fifth surface 34. For example, the second coating 56 may be disposed solely along the first coating 42 so as not to wrap around the corner 48 of the second element 24.

With continued reference to FIG. 5, in this variation, the second coating 56 may be sandwiched between the first coating 42 and the tape 50. More specifically, the tape 50 may abut the second surface 18 and wrap around the corner 48 of the second element 24 to contact both the boundary 46 of the first coating 42 and the second boundary 60 of the second coating 56 and fill at least a portion of the channel 36. Stated differently, the tape 50 may extend from the second surface 18 into the channel 36 and seal at least a portion of the channel 36, and each of the first coating 42 and the second coating 56, from the environment exterior to the vehicle 12.

Therefore, in the variation described with reference to FIG. 5, the emblem assembly 10 includes the first element 14, the transparent second element 24, the first coating 42 disposed on the third surface 26, wherein the first coating 42 includes vacuum metalized aluminum and is substantially free from degradation, the second coating 56 disposed on the first coating 42, and the tape 50 including acrylic and foam and disposed in contact with at least a portion of each of the second surface 18, the first coating 42, and the fifth surface 34 to thereby wrap around the corner 48, fill at least a portion of the channel 36, and adhere the second element 24 to the first element 14.

The tape 50 minimizes degradation of the first coating 42 over an operating life of the vehicle 12. For example, the first coating 42 is substantially free from corrosion after continued exposure to cleaning solutions and vehicle operating environments. In particular, the tape 50 sufficiently seals the channel 36 to prevent ingress of fluids and/or contaminants to thereby minimize contact between such fluids and/or contaminants and the first coating 42.

A method of forming the emblem assembly 10 is also disclosed and described with reference to FIG. 6. The method includes positioning the tape 50 onto the second element 24. For example, positioning may include pressing the tape 50 onto the third surface 26 of the second element 24, e.g., along the entire length of the third surface 26.

With continued reference to FIGS. 3 and 6, the method further includes, after positioning, wrapping at least a portion of the fifth surface 34 and the first coating 42 (FIG. 3) with the tape 50. For example, wrapping may include rolling the tape 50 onto each of the fifth surface 34 and the first coating 42, i.e., in the direction of arrows 62 in FIG. 6. That is, the tape 50 may be rolled so as to extend around the corner 48 (FIG. 3) of the second element 24 to thereby contact each of the boundary 46 (FIG. 3) of the first coating 42 and the fifth surface 34. In addition, for the variation including the second coating 56 described with reference to FIG. 5, wrapping may include rolling the tape 50 onto each of the fifth surface 34, the first coating 42, and the second coating 56. That is, the tape 50 may

US 8,617,671 B2

7

be rolled so as to extend around the corner **48** (FIG. **5**) of the second element **24** to thereby contact each of the boundary **46** of the first coating **42**, the second boundary **60** of the second coating **56**, and the fifth surface **34**. As set forth above, wrapping may include disposing the tape **50** on an entire length of the fifth surface **34**, as shown in FIG. **4**, or may include disposing the tape **50** on only a portion of the fifth surface **34**, as shown in FIG. **3**.

The method may further include, after positioning, repositioning the tape **50** onto the second element **24**. For example, if the tape **50** is misaligned, mispositioned, and/or misregistered on the third surface **26** of the second element **24**, the tape **50** may be repositioned. Likewise, if the fifth surface **34**, the first coating **42** (FIG. **3**), and/or the second coating **56** (FIG. **5**) is miswrapped with the tape **50**, the tape **50** may be repositioned. Repositioning may include, for example, peeling and re-adhering the tape **50** to a desired alignment, position, or location.

Referring again to FIGS. **3** and **6**, the method also includes, after wrapping, inserting the second element **24** into the first element **14**, e.g., in the direction of arrow **64**, whereby the tape **50** contacts each of the fifth surface **34**, the first coating **42** (FIG. **3**), and the second surface **18** to thereby form the emblem assembly **10**. For example, the second element **24** including the tape **50** disposed on the third surface **26** may be press fit into the cavity **20** (FIG. **6**) defined by the second surface **18** so that the interaction of the first element **14** and the second element **24** compresses and stretches the tape **50** therebetween. More specifically, the tape **50** may sufficiently contact, e.g., uniformly contact, both of the second surface **18** and the fifth surface **34** to seal off any potential entry routes for environmental contaminants and thereby protect the first coating **42**. That is, the tape **50** may be "wet-out" to uniformly contact each of the second surface **18** and the fifth surface **34**, minimize or eliminate any air pockets between the second surface **18**, the tape **50**, and the fifth surface **34**, and thereby protect the first coating **42**. For the variation including the second coating **56** described with reference to FIG. **5**, the tape **50** contacts each of the fifth surface **34**, the first coating **42**, the second coating **56**, and the second surface **18** to thereby form the emblem assembly **10**. That is, the tape **50** may uniformly contact each of the second surface **18** and the fifth surface **34**, minimize or eliminate any air pockets between the second surface **18**, the tape **50**, and the fifth surface **34**, and thereby protect each of the first coating **42** and the second coating **56**.

Therefore, referring to FIGS. **3** and **6**, inserting may include filling at least a portion of the channel **36** with the tape **50**. That is, upon inserting the second element **24** into the first element **14**, the tape **50** may contact the second surface **18** and extend from the second surface **18** into the channel **36** to thereby attach, e.g., adhere or bond, the second element **24** to the first element **14**. Consequently, inserting may include sealing the channel **36**, and therefore each of the first coating **42** (FIG. **3**) and the fifth surface **34** from environmental contaminants to prevent ingress of contaminants and/or fluids into the channel **36**. Therefore, inserting the second element **24** into the first element **14** minimizes fluid and/or contaminant contact with each of the first coating **42** and the fifth surface **34**. Likewise, for the variation including the second coating **56** (FIG. **5**), inserting may seal each of the first coating **42**, the second coating **56**, and the fifth surface **34** from exposure to such contaminants and/or fluids. As such, the method allows for economical and efficient formation of the emblem assembly **10**, and the emblem assembly **10** contributes to an increased perceived quality of the vehicle **12**.

While the best modes for carrying out the disclosure have been described in detail, those familiar with the art to which

8

this disclosure relates will recognize various alternative designs and embodiments for practicing the disclosure within the scope of the appended claims.

The invention claimed is:

1. An emblem assembly configured for attachment to a vehicle, the emblem assembly comprising:
   a first element configured for attachment to the vehicle and having a first surface and a second surface recessed from said first surface, wherein said second surface is substantially U-shaped;
   a second element configured for attachment to said first element and having;
   a third surface;
   a fourth surface spaced apart from said first surface, said second surface, and said third surface; and
   a fifth surface extending between said third surface and said fourth surface, wherein said fifth surface is spaced apart from said second surface to define a channel therebetween;
   a first coating disposed on said third surface; and
   a tape disposed in contact with at least a portion of each of said second surface, said first coating, and said fifth surface to thereby fill at least a portion of said channel and adhere said second element to said first element, wherein said tape is repositionable on said second element so that said tape contacts said first coating.

2. The emblem assembly of claim **1**, wherein said first coating is substantially free from corrosion.

3. The emblem assembly of claim **1**, wherein said tape adheres said second surface to said first coating.

4. The emblem assembly of claim **3**, wherein said fourth surface is substantially flush with said first surface.

5. The emblem assembly of claim **1**, wherein said tape substantially fills said channel.

6. The emblem assembly of claim **5**, wherein said tape has an edge that is substantially flush with said fourth surface.

7. The emblem assembly of claim **1**, wherein said tape has an elongation at break of at least 100% when measured in accordance with test method ASTM D-3759.

8. The emblem assembly of claim **1**, wherein said tape has a thickness of from about 0.2 mm to about 0.8 mm.

9. The emblem assembly of claim **1**, wherein said tape includes acrylic and foam.

10. The emblem assembly of claim **1**, wherein said first coating includes aluminum.

11. The emblem assembly of claim **1**, further comprising a second coating sandwiched between and disposed in contact with said first coating and said tape.

12. The emblem assembly of claim **1**, wherein said fifth surface and at least one of said third surface and said fourth surface defines an angle therebetween of less than or equal to 90°.

13. The emblem assembly of claim **1**, wherein said second surface is substantially U-shaped.

14. An emblem assembly configured for attachment to a vehicle, the emblem assembly comprising:
   a first element configured for attachment to the vehicle and having a first surface and a second surface recessed from said first surface, wherein said second surface is substantially U-shaped;
   a transparent second element configured for attachment to said first element and having:
   a third surface;
   a fourth surface spaced apart from said first surface, said second surface, and said third surface; and
   a fifth surface extending between said third surface and said fourth surface, wherein said fifth surface abuts

US 8,617,671 B2

9

said third surface to form a corner and wherein said fifth surface is spaced apart from said second surface to define a channel therebetween;

a first coating disposed on said third surface, wherein said first coating includes vacuum metalized aluminum and is substantially free from corrosion;

a second coating disposed on said first coating; and

a tape including acrylic and foam and disposed in contact with at least a portion of each of said second surface, said first coating, said second coating, and said fifth surface to thereby wrap around said corner, fill at least a portion of said channel, and adhere said second element to said first element, wherein said tape is repositionable on said transparent second element so that said tape contacts said first coating and said second coating.

**15**. The emblem assembly of claim **14**, wherein said second coating is an alkyd enamel.

**16**. The emblem assembly of claim **14**, wherein said first coating is visible through said fourth surface.

**17**. A method of forming an emblem assembly configured for attachment to a vehicle, the method comprising:

positioning a tape onto a second element that is different from a first element configured for attachment to the vehicle;

wherein the first element has a first surface and a second surface that is substantially U-shaped and recessed from said first surface;

10

wherein the second element has;

a third surface;

a fourth surface spaced apart from the first surface, the second surface, and the third surface; and

a fifth surface extending between the third surface and the fourth surface, wherein the fifth surface is spaced apart from the second surface to define a channel therebetween;

wherein a first coating is disposed on the third surface;

after positioning, wrapping at least a portion of the fifth surface and the first coating with the tape, wherein the tape is repositionable on the second element so that the tape contacts the first coating;

after wrapping, inserting the second element into the first element so that the tape contacts each of the fifth surface, the first coating, and the second surface to adhere the second element to the first element and thereby form the emblem assembly.

**18**. The method of claim **17**, wherein inserting includes filling at least a portion of the channel with the tape.

**19**. The method of claim **17**, wherein wrapping includes rolling the tape onto each of the fifth surface and the first coating.

**20**. The method of claim **17**, further comprising, after positioning, repositioning the tape onto the second element.

\* \* \* \* \*